**Case No. 22-1378**

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

---

**United States of America**,
Plaintiff-Appellant,

v.

**Lyndell Daniels,**
Defendant-Appellee.

---

On Appeal from the United States District Court
for the District of Colorado
The Honorable Regina M. Rodriguez, District Judge
D.C. Case No. 1:21-cr-00332-RMR-1

---

**Appellee's Corrected Answer Brief**

---

Office of the Federal Public Defender
633 17th Street, Suite 1000
Denver, Colorado 80202
Tel: (303) 294-7002
Fax: (303) 294-1192
Email: John_Arceci@fd.org

Virginia L. Grady
Federal Public Defender

John C. Arceci
Assistant Federal Public Defender

Attorneys for Appellee
Lyndell Daniels

Oral argument is requested.

May 31, 2023

# **Table of Contents**

Table of Authorities .................................................................................................. ii

Prior or Related Appeals............................................................................................ iii

Issue Presented ......................................................................................................... 1

Statement of the Case ............................................................................................... 1

      A.    An apartment complex resident calls 911 to report that several Black men in dark clothing have guns. ..................................................... 1

      B.    Police arrive and immediately detain Mr. Daniels, a Black man standing outside the complex wearing a bright orange jumpsuit. ............... 2

      C.    The district court finds that Mr. Daniels was unconstitutionally seized............................................................................................................ 4

Summary of Argument .............................................................................................. 5

Argument................................................................................................................... 6

    The district court properly concluded that Officer Idler unconstitutionally seized Mr. Daniels........................................................................................... 6

      A.    Preservation and standard of review...................................................... 6

      B.    The district court correctly found that the factors identified by the government provided little to no basis for suspecting Mr. Daniels of wrongdoing. ........................................................................................... 6

            1.    The 911 call ................................................................................. 8

            2.    The SUV ..................................................................................... 11

            3.    The location and time of day ..................................................... 16

      C.    The district court also correctly found that the totality of the circumstances did not establish that Officer Idler had reasonable suspicion to believe that Mr. Daniels was engaged in criminal activity..... 17

Conclusion................................................................................................................. 20

Statement Regarding Oral Argument........................................................................ 21

## <u>Table of Authorities</u>

### Cases

*Florida v. J.L.*, 529 U.S. 266 (2000) ................................................................. 10, 11

*Illinois v. Wardlow*, 528 U.S. 119 (2000) ................................................................ 14

*Jordan v. U.S. Dep't of Justice,* 668 F.3d 1188 (10th Cir. 2011) .......................... 16

*Romero v. Story*, 672 F.3d 880 (10th Cir. 2012) .................................................... 16

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 142 S. Ct. 2111 (2022) ....... 11

*United States v. Archuleta*, 619 F. App'x 683 (10th Cir. 2015) ................. 11, 18, 20

*United States v. Ballance*, 2022 WL 108330 (10th Cir. 2022) ............................... 15

*United States v. Batara-Molina*, 60 F.4th 1251 (10th Cir. 2023) .......................... 18

*United States v. Black*, 707 F.3d 531 (4th Cir. 2013) ................................. 11, 16, 19

*United States v. Briggs*, 720 F.3d 1281 (10th Cir. 2013) ................................. 14, 15

*United States v. Curry*, 965 F.3d 313 (4th Cir. 2020) ........................................... 17

*United States v. Davis*, 94 F.3d 1465 (10th Cir. 1996) ........................................... 14

*United States v. Fisher*, 597 F.3d 1156 (10th Cir. 2010) .......................................... 9

*United States v. Frazier*, 30 F.4th 1165 (10th Cir. 2022) ................................. 18, 19

*United States v. Guardado,* 699 F.3d 1220 (10th Cir. 2012) .................................. 17

*United States v. Hernandez*, 847 F.3d 1257 (10th Cir. 2017) ............................... 6, 20

*United States v. House*, 463 F. App'x 783 (10th Cir. 2012) .................................. 15

*United States v. Johnson*, 364 F.3d 1185 (10th Cir. 2004) ..................................... 18

*United States v. Kimoana*, 383 F.3d 1215 (10th Cir. 2004) ................................. 6, 12

*United States v. Madrid*, 713 F.3d 1251 (10th Cir. 2013) ................................. 10, 15

*United States v. Martinez*, 910 F.3d 1309 (10th Cir. 2018) ..................................... 9

*United States v. Navedo*, 694 F.3d 463 (3d Cir. 2012) ........................................................ 16

*United States v. Pena-Montes*, 589 F.3d 1048 (10th Cir. 2009) ........................................... 17

*United States v. Pettit*, 785 F.3d 1374 (10th Cir. 2015) ....................................................7, 19

*United States v. Robinson*, F. App'x 746 (10th Cir 2008) .................................................... 15

*United States v. Simpson*, 609 F.3d 1140 (10th Cir. 2010) ..................................................... 7

*United States v. Wood*, 106 F.3d 942 (10th Cir. 1997) .................................................4, 7, 19

*Ybarra v. Illinois,* 444 U.S. 85 (1979) ................................................................................. 16

## Prior or Related Appeals

None.

## Issue Presented

Whether the district court correctly found that police lacked reasonable suspicion to detain Mr. Daniels, a Black man in a bright-orange jumpsuit, when responding to a citizen's report that three Black men in dark sweatshirts and jeans were possessing firearms?

## Statement of the Case

### A.    An apartment complex resident calls 911 to report that several Black men in dark clothing have guns.

Late on Super Bowl Sunday, February 7, 2021, the Aurora Police Department (APD) received a 911 call. (Vol. I at 15, 107.)[1] The caller, who indicated she wished to remain anonymous, said that three Black men were hanging out in her apartment complex parking lot near the building's entrance and that they had guns. (*Id.* at 107.) She conceded that this wasn't an emergency, and that the men weren't committing any crimes. (*Id.*) But, she reported, they were "intermittently taking out guns and then putting them back in pockets," perhaps 'trying to prepare for something' she opined without elaboration. (*Id.*)

The caller described the clothing of each of the three individuals: one was wearing a black hoodie and black jeans; another was wearing a gray hoodie and blue jeans; and the last was wearing a black hoodie and jeans. (*Id.*) The caller also described a "dark color SUV" that the individuals had gotten in and out of, as well as a white or

---

[1] Record citations are to the volume of the government's appendices.

1

silver sedan nearby. (*Id.* at 107, 112.) Police were dispatched for a non-emergency area-watch request (*id.* at 107, 112), a type of call in which no crime has been reported but officers nonetheless travel to check out an area to ensure nothing is amiss (vol. IV at 37-38, 62).

> **B.      Police arrive and immediately detain Mr. Daniels, a Black man standing outside the complex wearing a bright orange jumpsuit.**

Aurora Police Officer William Idler arrived on the scene about three minutes after the call came in. (Vol. I at 107.)[2] The parking lot was well-lit, and the apartment complex was densely-populated. (*Id.*) He began walking towards the building, and observed a black SUV idling near the entrance; a dark red SUV and a silver car were also parked right nearby. (*Id.* at 107-08, 115.)

Mr. Daniels was standing in front of the building, around five to ten feet away from the black SUV. (*Id.* at 107.) He was wearing a bright orange jumpsuit, with an orange hood and what appeared to be a reflective strip across the front, along with a unzipped black jacket. (*Id.* at 107, 115.) As one officer on the scene agreed (vol. IV at 95), if there was one word to describe him that night, it would be "orange":

---

[2] Officer Idler was not privy to the 911 call itself, but instead received a transcribed summary, called "CAD notes," that, as pertinent here, identified the three subjects and the vehicles. (Vol. I at 111-12.)

2



(Vol. I at 17.)

As Officer Idler approached, he heard Mr. Daniels say something in a normal tone of voice, but he could not hear what. (*Id.* at 107-08.) The SUV then began to drive away at a normal rate of speed. (*Id.* at 108, 117.) As it did, Officer Idler raised his weapon, identified himself, and ordered Mr. Daniels to put his hands up. (*Id.* at 108.) Mr. Daniels complied immediately and stated, "Don't shoot." (*Id.*) Officer Idler then directed Mr. Daniels to get down on his knees. (*Id.* at 98.) During the course of the detention that followed, police obtained Mr. Daniel's name, before releasing him. (*Id.* at 108.)

Police also separately followed the dark SUV. They did not immediately pull it over because, the assigned officer explained, they did not have reasonable suspicion to do so. (*Id.* at 117.) The car drove lawfully, but eventually ran a red light and was stopped. (Vol. IV at 119.) A subsequent search located four guns—three of which the

vehicles' occupants lawfully possessed, and one, a Glock handgun, which had been reported stolen and was confiscated by police.[3] (Vol. IV at 119-21.)

### C.    The district court finds that Mr. Daniels was unconstitutionally seized.

Using Mr. Daniels' identity learned during the investigative detention, officers later ran a criminal history check and learned he'd been previously convicted of a felony offense. (Vol. I at 108.) With this information, they then obtained a warrant for his DNA. (*Id.*) After lab results found it likely Mr. Daniels' DNA was on the confiscated handgun, the government charged him with violating 18 U.S.C. § 922(g)(1). (*Id.* at 11, 106.)

Mr. Daniels moved to suppress all evidence stemming from his detention, arguing that Officer Idler lacked reasonable suspicion to detain him.[4] (*Id.* at 14.) After a long hearing (vol. IV at 3-179) and additional briefing (vol. I at 81, 88, 102), the district court agreed. (Vol. I at 106-21.)

In its written order, the court found that Mr. Daniels was seized at the moment Officer Idler ordered him at gunpoint to raise his hands and he complied. (*Id.* at 110-

---

[3] As the district court found, the events surrounding the traffic stop all occurred *after* Mr. Daniels' unlawful detention, and, therefore, play no role in the suppression analysis. *See United States v. Wood*, 106 F.3d 942, 944, 946 (10th Cir. 1997) (explaining that reasonable suspicion is evaluated based on facts known to the officer at the time of the detention).

[4] Mr. Daniels also challenged the warrant on other grounds, but those motions were mooted by the court's granting the motion to suppress. (Vol. IV at 3-14, 140, 160.)

11.) The only question then, the court explained, was whether at that time Officer Idler had reasonable suspicion that Mr. Daniels was engaged in criminal wrongdoing. (*Id.*) At the government's urging, the court found a handful of factors were relevant to that answer: (1) the 911 call (and accompanying CAD notes), which described the subjects and related vehicles; (2) the presence of the dark SUV at the complex that left as Officer Idler approached; and (3) the location (which Officer Idler had described as a 'high-crime area') and the late-evening time of the seizure. (*Id.* at 111.) The court considered these factors individually and in totality (all discussed in greater detail *infra*), and ultimately concluded that they did not provide reasonable suspicion to detain Mr. Daniels. (*Id.* at 110-21.) Accordingly, the court ordered the evidence stemming from his detention suppressed. (*Id.* at 121.)

The government's appeal follows.

## Summary of Argument

A seizure under the Fourth Amendment is permissible only if police have, at least, reasonable suspicion, that is, "a particularized and objective basis for suspecting an individual may be involved in criminal activity." This inquiry is individualized—as this Court has explained, the particular person that is stopped must be suspected of criminal activity.

Here, Officer Idler did precisely what the Fourth Amendment forbids—he detained Mr. Daniels without reasonable suspicion. The district court correctly concluded that a 911 call identifying three Black men in dark clothing with guns near a

dark SUV did not warrant seizing Mr. Daniels, a Black man clad in a bright-orange jumpsuit standing five to ten feet away from a dark SUV. The government's arguments to the contrary are unpersuasive and overlook key findings of the district court. Considering the evidence in the light most favorable to the district court's decision, this Court should affirm its order granting Mr. Daniels' motion to suppress.

<u>Argument</u>

**The district court properly concluded that Officer Idler unconstitutionally seized Mr. Daniels.**

    **A.    Preservation and standard of review.**

The district court granted Mr. Daniels' suppression motion. (Vol. I at 14, 106.) While the ultimate question of whether a seizure is reasonable is a legal question reviewed de novo, when reviewing the grant of a motion to suppress this Court views the evidence in the light most favorable to the defendant. *United States v. Hernandez*, 847 F.3d 1257, 1263 (10th Cir. 2017). In doing so, "[t]he credibility of witnesses, the weight to be given evidence, and the reasonable inferences drawn from the evidence fall within the province of the district court." *United States v. Kimoana*, 383 F.3d 1215, 1220 (10th Cir. 2004).

    **B.    The district court correctly found that the factors identified by the government provided little to no basis for suspecting Mr. Daniels of wrongdoing.**

The only way Officer Idler could have constitutionally seized Mr. Daniels was if he had reasonable suspicion that Mr. Daniels was engaged in criminal activity. The

district court concluded that the factors proffered by the government failed to satisfy its burden to make that showing. The court was correct in doing so.

Reasonable suspicion means that an officer must have "a particularized and objective basis for suspecting an individual may be involved in criminal activity." *United States v. Pettit*, 785 F.3d 1374, 1379-80 (10th Cir. 2015). And while some deference is accorded to an officer's ability to distinguish between innocent and suspicious actions, that deference is not unlimited. *United States v. Simpson*, 609 F.3d 1140, 1146-47 (10th Cir. 2010). The officer must point to specific, articulable facts. *Id.* at 1147. "Inchoate suspicions and unparticularized hunches . . . do not provide reasonable suspicion." *United States v. Wood*, 106 F.3d 942, 946 (10th Cir. 1997). Moreover, "some facts must be outrightly dismissed as so innocent or susceptible to varying interpretations as to be innocuous." *Id.* (internal quotation marks and citations omitted). The government bears the burden of proving the reasonableness of the officers' suspicion, *Pettit*, 785 F.3d at 1379, and courts must evaluate each factor purportedly supporting reasonable suspicion separately and in the aggregate, *id.* at 1380.

Here, the district court found Mr. Daniels was detained when Officer Idler ordered him at gunpoint to put his hands up and he complied. (Vol. I at 109-11.) All agree that the only factors relevant to that analysis are:

(1) the 911 call (and summary CAD notes);

(2) the dark SUV at the apartment complex that drove away as
    Officer Idler approached; and

(3) the location and time of day of the seizure.

Notably, the government does not challenge any of the district court's factual

findings as clearly erroneous. Rather, it's only complaint appears to be how the court

weighed the factors in its reasonable-suspicion analysis. But its arguments fall flat—

the district court correctly concluded that these factors, both alone and in

combination, were woefully insufficient to establish reasonable suspicion that *Mr.*

*Daniels* was engaged in criminal activity.

### 1. The 911 call

The government first faults the district court's evaluation of the 911 call, but its

argument misses the mark. While assailing the court's finding that the call was

insufficiently reliable, the government overlooks the court's other finding—that is,

that even on its own terms, the 911 call actually weighed *against* reasonable suspicion

as to Mr. Daniels. This latter holding, however, is fatal to the government's position

here.

Below, the district court found that consideration of the 911 call simply would

not help the government. (Vol. I at 114 ("Not only does the 911 call here fail to

support a finding of reasonable suspicion supporting the detention of Daniels, *it*

*actually weighs against such a finding*.") (emphasis added).) That's because the caller

8

identified three men "each wearing a dark sweatshirt and dark jeans," but when Officer Idler detained Mr. Daniels, "he was wearing a bright orange jumpsuit." (*Id.*) Under those circumstances, the court explained that it was simply "objectively unreasonable to believe that the caller could have been describing [Mr. Daniels]." (*Id.*) The call, it reaffirmed, therefore "weigh[ed] *against* a finding of reasonableness." (Vol. I at 115, 120.)

That conclusion was well-founded. As this Court has explained, "[a] police officer cannot legally detain a person simply because criminal activity is afoot. The particular person that is stopped must be suspected of criminal activity." *United States v. Fisher*, 597 F.3d 1156, 1158-59 (10th Cir. 2010). Where the only aspects of the caller's description that were at least somewhat particularized—the subjects' clothing—so plainly did not match Officer Idler's observation of Mr. Daniels, the court properly concluded that the call *did not* help the government, even *if* the report was taken at face value. *See, e.g.*, *United States v. Martinez*, 910 F.3d 1309, 1315-17 (10th Cir. 2018) (noting that suspect descriptions that police actually matched before detention—i.e., a possibly Native American man wearing glasses in a white Cadillac, (far more than present here)—"lacked the specificity required to satisfy the reasonable-suspicion standard").

Indeed, as the district court put it, "[o]ther than the fact that he was black, there was nothing about the Defendant to suggest that he was one of the individuals described by the 911 caller." (Vol. I at 120.) For that reason, and contrary to the

9

government's contention otherwise, the district court's comparison to *J.L. v. Florida* was apt. That the Supreme Court in *J.L.* concluded reasonable suspicion was lacking even when a caller's description actually *matched* the defendant, is a compelling counterpoint to the situation, as here, where that description *did not match*. *See, e.g.*, *Florida v. J.L.*, 529 U.S. 266, 272 (2000).

Ultimately, the government conflates the court's reliability analysis with its reasonable suspicion analysis. Reliability is an important factor, but it is not the *sine qua non* for whether a tip contributes reasonable suspicion as to a particular person. Put another way, even if it is "reliable," the call doesn't help the government a whit. And nothing in the government's argument below or on appeal overcomes this fatal flaw, one the district court affirmatively recognized—that the 911 call simply contains no facts indicating that Mr. Daniels or a person matching his description was involved in any wrongdoing. This alone answers the government's challenge on this factor, and this Court need go no further.

But of course, it also can, because the district court also did not err in also finding the call insufficient to carry much weight. A tip may contribute to the reasonable suspicion analysis if it has "sufficient information to provide reasonable suspicion that criminal conduct is, has, or is about to occur" and "sufficient indicia of reliability." *United States v. Madrid*, 713 F.3d 1251, 1258 (10th Cir. 2013). As the district court found (vol. I at 112-14), at base the call here simply relayed a description of a subject's readily observable location and appearance. It did not show any deeper

knowledge of concealed criminal activity, let alone predictive insight of future behavior or even instant illegality. Indeed, it bears emphasis that, just as in *J.L.*, the fact that the call alleged the presence of firearms is not indicative of criminality. *Id.* at 272-73. *J.L.* itself recognized that "[f]irearms are dangerous," *id.* at 272, yet still found reasonable suspicion to be lacking. Nor, of course, are guns inherently illegal. The Supreme Court has recognized that people generally have a constitutional right to carry guns in public, and police may not root reasonable suspicion on that fact, without more. *Id.*; *see also New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 142 S. Ct. 2111, 2133-35 (2022) (concluding that the plain text of the Second Amendment protects right to carry handguns publicly for self-defense); *United States v. Black*, 707 F.3d 531, 540 (4th Cir. 2013) (explaining same and noting that "[b]eing a felon in possession of a firearm is not the default status"); *United States v. Archuleta*, 619 F. App'x 683, 688 (10th Cir. 2015) (explaining that possession of a firearm, absent more, did not indicate unlawful behavior). Accordingly, even if the call also bore some indicia of reliability, *see Madrid*, 713 F.3d at 1258, the district court did not err in discounting the weight it was owed in the reasonable suspicion analysis on this additional and alternative ground.

2.  <u>The SUV</u>

Next, the government contends (at 21-25) that the district court erred in weighing the presence and actions of the black SUV at the apartment complex. It is wrong, on both the facts and law.

First, the crux of the government's argument (at 21-24) is causal—that is, that the SUV was suspicious because it departed "apparently at the direction of [Mr.] Daniels." But that contention is foreclosed by the district court's factual findings. Specifically, below the government argued that the dark SUV left the scene at a high-rate of speed, and that it did so at the urging of Mr. Daniels. (*E.g.*, Vol. I at 50, 85; Vol. IV at 150-57.) The district court rejected both contentions.

As to the first, the court found Officer Idler "to be not credible" when he testified that the SUV departed quickly because that assessment was contradicted by bodycam video. (Vol. I at 117 n.3.) Instead, the court found the car left "at a normal rate of speed." (*Id.*) Such a finding, of course, is well within the province of the district court. *See Kimoana*, 383 at 1220. As to the second, the court rejected any causal speculation, concluding instead that "it appear[s] that the SUV here simply left the parking lot." (Vol. I at 116-17.) That finding too makes sense; after all, Officer Idler did not hear what was said, and Mr. Daniels just as likely may have been saying "good-bye" as (the government implies) "the police are coming, you better go." Officer Idler offered nothing but his hunch that Mr. Daniels somehow caused the car to leave, and the court's rejection of that inference of *why* the car left (especially after finding the officer not credible as to *how* the car left), was well within its domain. *See Kimoana,* 383 at 1220.

The government does not challenge these findings are clearly erroneous, and that's largely fatal for its claim. Because what's left isn't much: Officer Idler saw at

least one dark SUV near where the 911 caller said it would be, five to ten feet away from where Mr. Daniels was standing, and it departed as he arrived and as Mr. Daniels said something. The district court was right to reject this as an insufficiently particularized and objective basis to suspect *Mr. Daniels* of criminal activity.

To the extent the government also attempts to frame aspects of the court's ruling on this factor as legal error, its efforts are unavailing.

First, for instance, the government suggests (at 22) that the district court "incorrectly concluded that the SUV and its actions <u>couldn't</u> *contribute* to reasonable suspicion." (First emphasis added.) The government misreads the court's ruling. The court clearly understood that the SUV *could* contribute to reasonable suspicion; that's why it evaluated the government's arguments and included the SUV in its totality-of-the-circumstances analysis. (Vol. I at 117-21.) Rather than finding the SUV *couldn't* contribute to the analysis, the court simply found that it *didn't* contribute to reasonable suspicion here. As noted above, that ruling was well-founded.

Next, the government asserts (at 23) that the court improperly discounted the SUV's departure because it held "headlong flight" was required before suspicion could be found. Again, the court did no such thing. Rather, it simply held that *this* departure did not add to reasonable suspicion, a determination well within this Court's caselaw.

To be sure, "nervous, evasive behavior," including "unprovoked flight upon noticing the police," may inform the reasonable suspicion calculus. *Illinois v. Wardlow*,

528 U.S. 119, 124 (2000). This may include, for example, "a sudden change of direction upon seeing law enforcement, increased speed in an apparent attempt to create distance from the officers, and repeated glances over one's shoulder." *United States v. Briggs*, 720 F.3d 1281, 1286-87 (10th Cir. 2013). But this Court has cautioned that "not all attempts to avoid police contact raise suspicions of criminal activity." *Id.* This includes merely departing from the presence of, or declining contact with, an officer; such behavior, the Court has explained, is "simply 'going about one's business' and is not suspicious conduct." *Id.* (quoting *United States v. Johnson*, 620 F.3d 685, 694 (6th Cir. 2010)).

*At most*, that's all that happened here with the SUV. And on similar facts, this Court has reached the same conclusion as the district court did below—that such mere avoidance of an encounter with law enforcement doesn't support reasonable suspicion.[5] *See, e.g.*, *United States v. Davis*, 94 F.3d 1465, 1468 (10th Cir. 1996) (holding that "making and then breaking eye contact with the officers, and then walking away" did not support seizure); *United States v. House*, 463 F. App'x 783, 788-789 (10th Cir.

---

[5] For this reason, if the district court hadn't rejected as a factual matter a connection between Mr. Daniels unknown comment and the SUV's departure, that causal argument would get the government nowhere; That is, even if SUV left because of the police, that fact would not add to reasonable suspicion under the circumstances. Moreover, it bears mention that Mr. Daniels, of course, did not himself seek to leave the scene in response to the police, but rather immediately submitted to being detained at gunpoint.

2012) (same where defendant "turned around and walked in the opposite direction when he saw police").[6]

     The government also tries one last angle, arguing (at 24) that the court based its decision on an officer's candid acknowledgment that he lacked reasonable suspicion to stop the SUV when it departed the apartment complex. Again, however, it misconstrues the court's ruling. The court first made a finding that the facts surrounding the SUV did not support reasonable suspicion. (Vol. I at 114-17.) It then *went on* to observe that the officer's assessment "further supports *this finding*." (*Id.* at 117-18 (emphasis added).) The court's observation of the officer's candor was a notable, albeit anecdotal, one that merely reinforced the finding it had already made.

---

[6] In contrast, the cases relied on by the government (at 23-24) are nothing like what occurred here. *See, e.g.*, *United States v. Robinson*, F. App'x 746, 748, 751 (10th Cir 2008) (as officer encountered a man who matched a 911 caller's description of someone making threats, the man looked at the police car and "immediately made an about-face and turned around and walked back behind the building," acting, as the district court found, "unnaturally"); *United States v. Ballance*, 2022 WL 108330 (10th Cir. Jan. 12, 2022) (officer encountered vehicle and two suspects who matched 911 caller's description, watched one exit the vehicle at a gas station and go inside only to then attempt to leave the scene on foot after exiting and seeing officers talking with the other suspect at the vehicle); *United States v. Madrid*, 713 F.3d 1251, 1254, 1257 (10th Cir. 2013) (considering 911 caller's observation that "suspects began 'scattering'" when police cars drove past location where altercation was occurring); *Briggs*, 720 F.3d at 1283, 1286-87 (when two men saw officers' vehicle they immediately turned direction, while one repeatedly looked over his shoulder at the officers while grabbing at the waistline of his pants where officer's training indicated illegal weapons were often kept, and then picked up their pace significantly and ultimately split up as officers got closer).

One final point supports the district court's conclusion that the SUV added nothing to the reasonable suspicion calculus against Mr. Daniels. That is, even *if* reasonable suspicion could be said to exist to detain the occupants of the SUV (which it did not), as Mr. Daniels argued below (vol. IV at 147-48) that suspicion did not extend to him by virtue of the threadbare association of being five to ten feet away from the vehicle and saying something. *See United States v. Black*, 707 F.3d 531, 540 (4th Cir. 2013) ("[W] refuse to find reasonable suspicion merely by association."); *Romero v. Story*, 672 F.3d 880, 887 (10th Cir. 2012) (declining to find reasonable suspicion based on temporal and geographic proximity to a crime); *United States v. Navedo*, 694 F.3d 463, 468-69 (3d Cir. 2012) (rejecting transference of reasonable suspicion from one person to another); *accord Ybarra v. Illinois,* 444 U.S. 85, 91 (1979) (explaining that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person.") And while the district court ultimately did not reach this additional legal ground, this Court can, of course, affirm for any reason supported by the record. *See, e.g.*, *Jordan v. U.S. Dep't of Justice,* 668 F.3d 1188, 1200 (10th Cir. 2011) (explaining that this Court may affirm on any basis supported by the record, including arguments not reached by the district court).

### 3. The location and time of day

The government does not appear to quibble with the district court's treatment of the facts that the detention occurred at night in what Officer Idler described as a

high-crime area. As the court recognized (vol. I at 118), while these facts may be considered in the totality-of-the-circumstances analysis, they carry little weight and cannot alone provide sufficient suspicion to detain someone. *See, e.g.*, *United States v. Pena-Montes*, 589 F.3d 1048, 1055-56 (10th Cir. 2009) ("That the stop occurred in a high-crime area is a relevant consideration but does not permit police to detain an individual without additional, particularized observations."); *United States v. Guardado*, 699 F.3d 1220, 1223 (10th Cir. 2012) (recognizing that time of day can contribute to the totality analysis).

That's because, as the Fourth Circuit recently explained, undue reliance on a person's presence in a high-crime area at night would deem residents of those neighborhoods "less worthy of Fourth Amendment protection by making them more susceptible to search and seizure by virtue of where they live." *United States v. Curry*, 965 F.3d 313, 331 (4th Cir. 2020) (en banc) (rejecting exigency as justification for detaining a person near an apartment complex at night, in a high-crime area, after several gunshots were fired).

**C.    The district court also correctly found that the totality of the circumstances did not establish that Officer Idler had reasonable suspicion to believe that Mr. Daniels was engaged in criminal activity.**

Finally, the government claims the district court failed to weigh the factors together. Again, it misreads the court's ruling.

At the evidentiary hearing, the district court recognized the import of the totality-of-the-circumstances analysis, and directed counsel to identify precisely what facts and factors that inquiry included. (Vol. IV at 133, 154-55, 164; *accord* Vol. I at 81, 88.) The court then evaluated each of the specific factors identified by the government as supporting reasonable suspicion both individually and cumulatively in its written order. (Vol. I at 110-21.) Indeed, it did the latter under a two-and-a-half-page section titled "Totality of the Circumstances," in which it thoroughly recounted what occurred leading up to Mr. Daniels' detention and explained why the government's factors were altogether insufficient to suspect Mr. Daniels of criminal activity. (*Id.* at 119-21.)

In fact, the court did *precisely* what this Court has instructed district courts to do, and what it does itself: evaluate each reasonable suspicion factor individually, and then together. *Compare* Vol. I at 110-21 *with, e.g.*, *United States v. Frazier*, 30 F.4th 1165, 1175-76 (10th Cir. 2022) (considering factors first individually and then in totality); *United States v. Batara-Molina*, 60 F.4th 1251, 1255-59 (10th Cir. 2023) (same); *United States v. Archuleta*, 619 F. App'x 683, 688-90 (10th Cir. 2015) (same).[7]

---

[7] The court's approach below stands in stark contrast to *United States v. Johnson*, the only case cited by the government, and where the district court "mention[ed] the appropriate 'totality of the circumstances' standard only once, in passing" and only after rejecting each factor individually. 364 F.3d 1185, 1189-90 (10th Cir. 2004).

Moreover, the government's criticism is stranger still given the cursory form of *its own* totality argument. Because over the span of just two paragraphs (at 26-27) it simply relists the factors and asserts they add up to reasonable suspicion. But this Court has cautioned against such "[r]eliance on the mantra 'the totality of the circumstances" to "metamorphose [] facts into reasonable suspicion." *Wood*, 106 F.3d at 948. All told, if there is a failure to articulate the totality of the circumstances in this case, it rests in the government's analysis, not the district court's. The court simply did not err as the government claims.

But in any event, the government's totality assertion is also just wrong. Reasonable suspicion is an individualized inquiry. *Pettit*, 785 F.3d at 1379-80. "In other words, the suspicious facts must be specific and particular to the individual seized." *United States v. Black*, 707 F.3d 531, 540 (4th Cir. 2013). They were not here. Put simply, while arriving to investigate a report about Black men in dark hoodies and jeans holding guns near a dark SUV and light sedan, Officer Idler's first action was to pull his handgun and order a Black man in a bright-orange jumpsuit to get his hands up and body down on the ground. Nothing in the 911 call, or that the officer observed in the seconds before detaining Mr. Daniels, created the requisite reasonable suspicion that Mr. Daniels was engaged in criminal conduct necessary for this action. "Reasonable suspicion may be a low bar, but it is not that low." *Frazier*, 30 F.4th at 1178. Officer Idler had a hunch, nothing more, and considering the record in the light most favorable to Mr. Daniels, the district court did not err in holding that wasn't

19

enough. *See, e.g.*, *Hernandez*, 847 F.3d at 1267-69 (affirming district court's grant of suppression motion where defendant's proximity to possible crime at late-hour in high-crime area did not amount to reasonable suspicion); *Archuleta*, 619 F. App'x at 690-91 (same despite defendant's criminal history and presence in high-crime area late at night). The court's order should be affirmed.[8]

## <u>Conclusion</u>

For these reasons, this Court should affirm the district court's order granting Mr. Daniels' motion to suppress.

---

[8] One final point merits brief mention. The government periodically claims (at 19, 27-28) that the district court erred by remarking on the existence of innocent explanations or innocuous facts. It makes some hay of this, but only to build a strawman: the district court committed no such error. Such observations are valid; after all, "some facts must be outrightly dismissed as so innocent or susceptible to varying interpretations as to be innocuous." *Wood*, 106 F.3d at 946. And in any event, to the extent the court noted such innocuous facts here, it did so only in highlighting the relative dirth of those facts suggesting anything suspicious as to Mr. Daniels. (Vol. I at 119-21.) The court did not discount, let alone reject, any of the government's proffered reasonable suspicion factors on such a basis. No error occurred.

## Statement Regarding Oral Argument

Mr. Daniels does not object to the government's request for oral argument,

which counsel also believes will assist the court in adjudicating the issues presented.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender

By: /s/ John C. Arceci
JOHN C. ARCECI
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, Colorado 80202
(303) 294-7002
Email: John_Arceci@fd.org

## __Certificate of Compliance__

As required by Fed. R. App. P. 32(g)(1), I certify that this brief is proportionally spaced and contains 5,091 words. I relied on my word processor to obtain the count, and the information is true and correct to the best of my knowledge.

_/s/ John C. Arceci_

John C. Arceci
Assistant Federal Public Defender